# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **KALBIAN HAGERTY LLP**<br>888 17th Street NW<br>Suite 1200<br>Washington, DC 20006<br><br>　　　　Plaintiff<br><br>　　v.<br><br>**PWT WASSER UND**<br>**ABERWASSERECHNIK GmbH**<br>Platanenallee 55<br>64673 Zwingenberg<br>Germany<br><br>　　　　Defendant. | Civil Action No. 1:22-cv-00224 |

# COMPLAINT

　　Plaintiff Kalbian Hagerty LLP ("Plaintiff" or "Kalbian Hagerty"), by counsel, files its Complaint against Defendant PWT Wasser Und Aberwasserechnik GmbH ("PWT" or "Defendant") and states as set forth below.

## INTRODUCTION

　　1.　　On or about May 29, 2018, Kalbian Hagerty, a law firm, entered into a Legal Services Agreement ("LSA") with PWT under which Kalbian Hagerty agreed to defend PWT in an arbitration before the International Chamber of Commerce (the "ICC") initiated by SAMA Al-Douh for General Contracting, Real Estate and Tourism Investment, Ltd. ("SAMA") (the "Arbitration").  Under the LSA (attached hereto as Exhibit 1), PWT was to pay Kalbian Hagerty pursuant to a hybrid fee structure.  The first component of the hybrid structure was a fixed fee.  The second was a success fee giving Kalbian Hagerty a success fee in three scenarios: (i) one for

the dismissal of SAMA's claim; (ii) a second, for success on PWT counterclaim; and (iii) a cumulative success fee against SAMA's claim and for PWT's counterclaim. PWT succeeded on the first of these scenarios, by obtaining dismissal of SAMA's entire claim. That outcome resulted in PWT eliminating a potential US$44 million liability off of PWT's books. Since the completion of the Arbitration, PWT has paid Kalbian Hagerty only US$200,000 of the total US$1,578,339.11 owed.

## THE PARTIES

2. Kalbian Hagerty, located at 888 17th Street NW, Suite 1200, Washington, DC, 20006, is a limited liability partnership organized and existing under the laws of the District of Columbia, with an office and principal place of business in Washington, D.C., and is a licensed provider of legal services in the District of Columbia. Since 2004, Kalbian Hagerty has also had an office located in Abu Dhabi, United Arab Emirates ("UAE") where it provides legal services.

3. PWT is a German company with its principal place of business in Zwingenberg, Germany and was a client of Kalbian Hagerty in the Arbitration.

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction over this dispute pursuant to 28 U.S.C. § 1332 based on diversity of citizenship. Plaintiff is a citizen of the District of Columbia. Defendant is a citizen of Germany. The amount in controversy exceeds $75,000.

5. This Court has personal jurisdiction over Defendant pursuant to the LSA, under which Defendant consented to jurisdiction by agreeing, *inter alia*:

> … [I]f any dispute arises or relates to PWT's failure to make payment as required here or agreed in writing between PWT and the Firm [Kalbian Hagerty], PWT grants the Firm the exclusive right to pursue such claim in the courts of PWT's jurisdiction of establishment; its main office location; or in any other jurisdiction that the Firm deems appropriate to seek remedy.

6. Venue is proper under 28 U.S.C. § 1391.

**FACTUAL ALLEGATIONS COMMON TO ALL COUNTS**

A. **The Dispute Between SAMA and PWT and the Request for Arbitration.**

7. The Arbitration arose out of the relationship between PWT and SAMA, who had agreed to cooperate to design and build a water treatment plant in Samawa, Iraq (the "Project"). The employer of the Project was the Iraqi Ministry of Municipalities and Public Works (the "Employer" or "MMPW"). SAMA and PWT entered into an agreement with one another which became effective on or about April 17, 2012 (the "Subcontract").

8. On or about February 12, 2014, SAMA was terminated from the Project by MMPW. Prior to the termination, SAMA failed to fulfil its obligations under the Subcontract because it: (a) completely mismanaged the Project; (b) defectively executed its scope of work; (c) failed to finance the Project properly; and (d) disrupted and hindered PWT's progress on the Project. All of that conduct resulted in considerable delays and costs to the Project that were primarily borne by PWT. SAMA's abysmal performance on the Project forced PWT to terminate SAMA as a subcontractor. In retaliation, SAMA immediately initiated litigation in Iraqi local courts, despite the Subcontract clearly requiring all disputes be litigated in ICC arbitration.

9. Between in or about early 2014 and March 2015, SAMA filed two separate court actions in the courts of Iraq regarding its dispute with PWT.

a. In SAMA's first case filed in or about early 2014, it sought damages for work performed, lost profits and expenses of maintaining the bank guarantees ("First SAMA Case"). However, at the Court of Appeal, SAMA dropped its claim for work performed and lost profits but fully adjudicated its claim for the expenses to maintain the bank guarantees. Accordingly, the Iraqi Court of Cassation awarded SAMA the expenses for the bank guarantees.

b.  Seeking what it could not achieve in its First Iraq Case, on or about March 8, 2015, SAMA filed a second claim for damages for work performed and lost profits (the "Second Iraq Case").  However, this time SAMA was not so successful and the Iraqi Court of Cassation ruled that SAMA was entitled to nothing and that it was PWT that had been damaged by SAMA's failure to perform.  Thus, the Iraqi Court of Cassation found that it was PWT, which was damaged to the tune of 16,047,724,571 Iraqi dinars ("IQD"), although, the Court of Cassation did not award that amount to PWT because PWT had never filed a claim for damages against SAMA in the Second Iraq Case.

c.  PWT then filed a lawsuit in Iraq against SAMA in or about August 2017 to claim the IQD 16,047,724,571 in damages found by the Court of Cassation in the Second Iraq Case.  Faced with an impending loss of IQD 16,047,724,571, SAMA suddenly argued for a suspension of PWT's claims on the grounds that all disputes should be litigated in arbitration only.  Consequently, PWT's case was suspended on or about November 2, 2017 due to the arbitration clause.

10.  On or about April 1, 2018, SAMA commenced the Arbitration by submitting to the ICC a Request for Arbitration ("RFA").  SAMA alleged, *inter alia*, that PWT wrongfully terminated the Subcontract, and that SAMA was entitled to damages for (a) work performed, (b) lost profits, and (c) expenses arising from maintaining bank guarantees.  These were all claims that had been litigated by SAMA in the First and Second Iraq Cases.  While SAMA had lost its claim for work performed and lost profits, inexplicably SAMA again requested the expenses for maintaining the bank guarantees, a claim it had actually already won in the First Iraq Case.  In addition to these claims, SAMA also requested the cancellation or replacement of all bank guarantees that it had issued for the Project, and the return of all cash securities pledged in support

of those bank guarantees. SAMA sought US$9.8 million in damages for both its previously litigated and new claims.

**B.      The LSA Between PWT and Kalbian Hagerty.**

11.     Beginning in or about May 2018, Haig V. Kalbian of Kalbian Hagerty and Mark Tulloss, an American attorney and agent for PWT, held discussions, both over the telephone and via e-mail, regarding the possibility of Kalbian Hagerty representing PWT in the Arbitration.

12.     During these conversations, Mr. Tulloss discussed Kalbian Hagerty defending PWT and also asserting a potential counterclaim on behalf of PWT which Mr. Tulloss estimated at US$16,000,000.

13.     Messrs. Kalbian and Tulloss discussed a hybrid fee structure under which PWT would compensate Kalbian Hagerty for its legal services via: (a) a fixed fee to be paid in a series of installments; and (b) a success fee based on Kalbian Hagerty's ability to minimize or eliminate the possibility of damages awarded against PWT and the amount of any recovery based on PWT's counterclaim.

14.     As part of the discussions and negotiations regarding the success fee, the parties discussed the fact that the amount of SAMA's claim could increase during the life of the Arbitration.  For example, on or about May 21, 2018, Mr. Kalbian sent an email to Mr. Tulloss discussing the terms of the LSA and pointing out that:

> It is our understanding that, through its Request for Arbitration Sama is seeking US$ 9,800,000 in damages.  As our experience demonstrates, that number can always go up but for the purposes of this proposal, we will use the $9.8M figure.

15.     As a result, the parties discussed calculating the success fee based on PWT's "net recovery," *i.e.*, the difference between PWT's counterclaim for US$16,000,000 and SAMA's claim of US$9,800,000 (which was a difference of approximately US$6 million).

16. The parties discussed various examples during the negotiations and in the language of the LSA to reflect the fact that the amount of the claims and the resulting success fee would fluctuate.

17. On or about May 29, 2018, Kalbian Hagerty and PWT entered into the LSA. Although the LSA was issued on Kalbian Hagerty letterhead, the fee structure was adopted completely from language prepared by Mr. Tulloss (as reflected in an email sent by Mr. Tulloss to Mr. Kalbian on or about May 24, 2018). On information and belief, during the finalization of the LSA, Mr. Tulloss was working directly under the supervision and behest of Philip Bourne, PWT's Regional Director, who was entrusted with overseeing and managing the Arbitration.

18. The LSA was signed by Mr. Kalbian on or about May 29, 2018 and by Marcel Salazar, the Managing Director of PWT on or about May 30, 2018.

    a. Pursuant to the LSA, Kalbian Hagerty would defend PWT against SAMA's claims in the Arbitration and file a counterclaim against SAMA.

    b. The LSA detailed the agreement for "Fees and Expenses" between the parties. First, PWT agreed to pay Kalbian Hagerty a fixed fee of US$700,000 in a series of monthly payments over a period of one year.

    c. Second, the LSA detailed a success fee which had three different prongs.

        i. The KSA provided that PWT would pay "$100,000 payable within 30 days of SAMA's claims being dismissed on procedural grounds." The "procedural grounds" which were contemplated by the parties included the *res judicata* argument PWT intended to make based on the rulings in the First Iraq Case and the Second Iraq Case.

        ii. The LSA further stated:

> If SAMA's claims are tried on the merits [Kalbian Hagerty was entitled to], a success fee of 3.33% of any amount awarded that is less than USD 6 million. By way of example, an award on the merits resulting in a zero recovery for SAMA would net a success fee of USD 200,000 (3.33% of USD 6 million saved); similarly, a SAMA award of USD 3 million would net a success fee of USD 100,000 (($6,000,000-$300,000 = $300,000).

The examples were included to reflect the discussion and understanding of Messrs. Kalbian, Tulloss, and Bourne that the amount of the claims and the resulting success fee would very likely fluctuate, and that SAMA's claims could be higher than US$6 million. The US$6 million figure was never intended to serve as a cap.

        iii.     The LSA provided that if Kalbian Hagerty was successful in its "Prosecution of PWT counterclaim (presently estimated at USD 16 million)" it was entitled to "20% of any executed judgment."

    d.    The LSA also included a "Dispute Resolution" provision which stated in part:

> In the event, however, that there is a fee dispute of $5,000 or more, such dispute arising out of the formation, performance, interpretation, nullification, termination or invalidation of this agreement or arising therefrom or related thereto, in any manner whatsoever, shall be settled exclusively by the courts of Abu Dhabi, U.A.E. under the laws of the U.A.E.
>
> However, if any dispute arises or relates to PWT's failure to make payment as required here or agreed in writing between PWT and the Firm [Kalbian Hagerty], PWT grants [Kalbian Hagerty] the exclusive right to pursue such a claim in the courts of PWT's jurisdiction of establishment, its main office location, or any other jurisdiction that [Kalbian Hagerty] deems appropriate to seek remedy.

19. In a letter dated October 27, 2020, Kalbian Hagerty and PWT amended the LSA. Mr. Salazar signed the amendment on or about November 2, 2020.

  a. In the amendment, PWT agreed to pay Kalbian Hagerty an additional US$100,000 fixed fee over a three-month period.

  b. In consideration for the additional US$100,000, the percentage of the success fee to be paid to Kalbian Hagerty for prosecution of PWT's counterclaim would be reduced to: (i) 15% of the first US$30,000,000 awarded and collected on PWT's counterclaim; and (ii) 10% of the amount over US$30,000,000 awarded and collected on PWT's counterclaim.

  c. The success fee related to the defense of SAMA's claims against PWT was not altered. PWT fulfilled its obligation and paid the US$100,000 under the terms of the October 27, 2020 letter.

**C. The Arbitration Proceedings.**

20. Between May 29, 2018 and August 2021, Kalbian Hagerty represented PWT in the Arbitration. The work was performed by attorneys located in Kalbian Hagerty's Washington D.C. Office and its Abu Dhabi office.

21. On or about October 9, 2018, PWT and SAMA (through their respective counsel) and the ICC Tribunal agreed and signed the Specific Procedural Rules ("SPR") for the Arbitration. The SPR represented the procedural rules under which the Arbitration would be conducted.

22. On or about October 25, 2018, Kalbian Hagerty filed on behalf of PWT a request that the proceedings be bifurcated to allow PWT to fully brief the *res judicata* issue regarding SAMA's prior claims already litigated in Iraq. On or about December 5, 2018, the ICC Tribunal denied the motion to bifurcate and ruled that it would consider the *res judicata* arguments concurrently when it heard the case on the merits.

23. The denial of the bifurcation request cleared the way for SAMA to file its Statement of Claim on or about March 31, 2019. In its Statement of Claim, SAMA for the most part

reasserted the same claims and sought damages of US$ 9,800,000.00, as previously sought in its RFA.

24. Subsequently, SAMA dramatically escalated this claim to US$44,394,568 in response to PWT's counterclaim for US$88,867,079, which PWT's expert witnesses calculated was the cost of the delay caused by SAMA.

**D.   Role of SAMA's Counsel.**

25. While the size of the claims were substantial, this is not what made the Arbitration challenging and consume more time and effort than anyone could reasonably have expected. Although SAMA's counsel taught arbitration at the University of Jordan School of Law (and presumably understood how to conduct arbitrations), he conducted the arbitration without any consideration for the SPR or the rulings of the ICC Tribunal for that matter. Basically, SAMA's counsel treated the SPR as advisory and not mandatory rules of the Arbitration for both parties to strictly follow. That is, SAMA's counsel conducted the arbitration as if the SPR were an *a la carte* menu and he could choose which rules to follow or not follow. This behavior substantially increased the burden on Kalbian Hagerty to not only deal with SAMA's claims on the merits, but also continuously deal with its wholesale disregard of the SPR. As the ICC Tribunal noted, the Arbitration was burdened by "around 20 requests outside the Procedural Timetable. This is not a usual number when compared to normal arbitration proceedings." That burden was imposed solely by SAMA and its counsel's conduct in the Arbitration.

26. Kalbian Hagerty was required to file multiple requests with the ICC Tribunal to compel SAMA to comply with the basic requirements of the SPR. SAMA counsel's behavior was something that neither Kalbian Hagerty, nor PWT, through Mr. Tulloss, an experienced attorney, foresaw as being necessary at the time they negotiated the LSA.

27. In short, SAMA's counsel disregarded the SPR and the ICC Tribunal's directives from the start of the arbitration and never stopped.

    a. SAMA's violations included, but were not limited to: (i) submitting exhibits in a language other than the Arbitration's agreed language; (ii) failing to translate exhibits that were again in a language other than the Arbitration's agreed language; and (iii) failing to submit exhibits that SAMA itself referenced or were referenced by its appointed experts.

    b. SAMA submitted multiple expert reports, outside the originally scheduled timeframe for doing so in the Arbitration.

    c. SAMA submitted multiple versions of the same expert reports that included material differences between those reports.

    d. SAMA repeatedly misrepresented exhibits referenced in its submissions.

    e. SAMA impermissibly named PWT in an Iraqi court proceeding to compel SAMA's own witness to attend the Arbitration.

28. This wholly unexpected conduct, among others, dramatically increased the time and costs to Kalbian Hagerty's representation.

    a. First, Kalbian Hagerty was compelled to repeatedly file papers with the ICC Tribunal objecting to SAMA's violations of the SPR. On or about December 3, 2018, the ICC Tribunal stated that SAMA "is reminded to strictly abide by the Specific Procedural Rules in its future submissions."

    b. Second, SAMA's conduct necessitated Kalbian Hagerty seeking time extensions because SAMA had not filed its submissions on time or correctly. In one instance, it took SAMA nearly one month to correct all of the deficiencies raised.

    c. Third, Kalbian Hagerty needed to file requests with the ICC Tribunal, pointing out repeated deficiencies in SAMA's expert submissions. For example, on two occasions, SAMA's counsel filed different versions of the same expert report. On or about February 7, 2020, the ICC Tribunal struck down a revised version of SAMA's expert report, because "the new version of [SAMA's expert report was] different from the old version submitted on 21 January 2020 in terms of form and content."

    d. Fourth, Kalbian Hagerty was required to spend considerable time challenging PWT's inclusion in a local Iraqi proceeding that SAMA's counsel initiated as cover for its own failings in the Arbitration.

**E. Impact of the Covid-19 Pandemic.**

  29. After wrestling with SAMA counsel's conduct for the duration of the Arbitration, Kalbian Hagerty believed the Arbitration would finally and efficiently close when the hearing was conducted in March 2020 in Amman, Jordan. However, the unexpected COVID-19 pandemic turned out to be equally impactful on Kalbian Hagerty's time and costs as SAMA counsel's conduct.

  30. Beginning in January 2020 and continuing through February 2020 and into early March 2020, Kalbian Hagerty staff spent a significant amount of time preparing for the evidentiary hearing. For example, Kalbian Hagerty attorneys met with and prepared witnesses for their testimony at the hearing, including Mr. Bourne, who attended the prep sessions with all of PWT's fact and expert witnesses. Personnel for Kalbian Hagerty spent significant time making logistical arrangements, including, but not limited to, arranging for court reporters and translators, and arranging for a hotel in Amman where the evidentiary hearing could take place.

31. In early March 2020, the evidentiary hearing was postponed due to the COVID-19 pandemic and rescheduled for a date in June 2020. As that date approached, the hearing was postponed a second time to October 2020. Ultimately, the evidentiary hearing was postponed a third time, and finally took place in Istanbul in late November and early December 2020. Many of the hours Kalbian Hagerty spent preparing witnesses and making logistical arrangements had to be repeated as each hearing date approached and changed: once, twice and three times. The repeated rescheduling of the hearing was a wholly unforeseen development, which increased the amount of time Kalbian Hagerty spent representing PWT.

32. Between November 23, 2020 and December 3, 2020, the evidentiary hearing on the merits of the parties' respective claims in the Arbitration was finally held in Istanbul, Turkey.

33. Following the conclusion of the Arbitration, the parties submitted their respective post-hearing briefs and costs in the Arbitration. On or about March 15, 2021, Kalbian Hagerty filed its submissions on costs in the Arbitration. This submission was reviewed, approved, and ratified by Mr. Bourne on behalf of PWT prior to filing. It stated that the legal fees expended by Kalbian Hagerty for the Arbitration was US$2,809,891.

**F.     The Arbitration Award.**

34. On or about July 12, 2021, the ICC Tribunal issued its Award. The ICC Tribunal dismissed all of SAMA's claims, partly on *res judicata* grounds and partly on jurisdictional grounds:

    a. SAMA's claims for (i) expenses, (ii) lost profits, (iii) expenses relating to the Bank Guarantees including the payment of the value of the Bank Guarantees (*i.e.*, the value of the security) were barred under the *res judicata* doctrine; and

  b. SAMA's other claims for (i) cancellation of the Bank Guarantees, (ii) replacement of the Bank Guarantees and (iii) release of the security were dismissed on jurisdictional grounds.

35. The ICC Panel also rejected PWT's Counterclaim.

**G. PWT Paid a Portion (but not all) of Kalbian Hagerty's Fees Due Under the LSA.**

36. Between May 29, 2018 and February 1, 2021, PWT paid Kalbian Hagerty the $800,000 fixed fee due under the LSA (as amended).

37. On or about July 22, 2021, Kalbian Hagerty submitted a Final Invoice to PWT for US$1,578,339.11. That amount was broken down as follows:

  a. US$100,000, representing the amount payable within 30 days of SAMA's claims being dismissed on procedural grounds," since SAMA's claims were dismissed on both *res judicata* and jurisdictional grounds; and

  b. US$1,478,339.11, which represents 3.33% of the US$44,394,568.00, which was the amount of damages sought by SAMA at the hearing.

38. During a telephone conversation held in or about the week of August 8, 2021, Philip Bourne of PWT, who had served as PWT's primary contact during the Arbitration, stated that PWT did not contest it owed Kalbian Hagerty a success fee of US$300,000 for Kalbian Hagerty's successful defense of SAMA's claims during the Arbitration. He requested that Kalbian Hagerty issue a new invoice for that amount.

39. Based on Mr. Bourne's statement, Kalbian Hagerty submitted two new invoices on or about August 15, 2021, voiding the July 22, 2021 invoice. Invoice No. 115 was for US$300,000 and Invoice No. 116 was for US$1,278,339.11.

40. Despite Mr. Bourne's commitment and apparent authority, PWT reneged on his assurance of payment and refused to pay either of the two August 15, 2021 invoices.

41. In a letter sent on or about August 30, 2021, Mr. Salazar of PWT discussed the US$300,000 amount and stated: "[b]ased on our understanding, Kalbian Hagerty LLP is not entitled to the USD 100,000 under the first paragraph. PWT only owes your law firm USD 200,000 under the second paragraph of the success fee clause. We therefore ask you to cancel invoice 115 and issue an invoice for USD 200,000. Please note we have no issues in paying this amount." With respect to Invoice No. 116, Mr. Salazar stated, *inter alia*, "we disagree with your interpretation of the LSA."

42. In a letter sent on or about August 30, 2021, Haig Kalbian stated: "I was disappointed that you are now challenging the USD 300,000 that I thought we had agreed was 'uncontested.' In light of your 30 August 2021 letter, I believe we cannot continue to represent PWT in any capacity whatsoever. Accordingly, this letter serves as a formal notice of disengagement."

43. Beginning on or about September 6, 2021, Kalbian Hagerty began corresponding with Heiko Heppner, German outside counsel for PWT, about the possibility of resolving the dispute between Kalbian Hagerty and PWT through alternative dispute resolution.

44. On or about September 17, 2021, Mr. Kalbian sent an email to Mr. Heppner, attaching a letter to Mr. Salazar.

 a. The letter stated in part: "To follow on my recent correspondence with PWT's attorney Heiko Heppner, I have attached Invoice No. 117 for US$200,000 and Invoice No. 118 for US$100,000. We are hereby voiding and withdrawing our Invoice No. 115 dated August 15, 2021 (for US$300,000). We do so without prejudice to our position in the dispute between us."

      b.      The letter also stated: "With respect to invoice No. 118 (which represents the US$100,000 'payable within 30 days of SAMA's claims being dismissed on procedural grounds' under the Legal Services Agreement), we understand that PWT is contesting that this amount is owed."

      c.      The letter also stated: "We are NOT voiding or withdrawing Invoice No. 116 sent to you on August 15, 2021 for US$1,278,339.11, which represents the 'contested amount' of the success fee owed because the ICC Arbitration award found against SAMA on its underlying claim thereby dismissing SAMA's nearly $45 million claim in its entirety.

      45.      On September 28, 2021, Kalbian Hagerty and PWT entered into a Dispute Resolution Agreement ("DRA").  It was signed by Haig Kalbian on behalf of Kalbian Hagerty on or about September 28, 2021 and a copy was transmitted by email to PWT's counsel that day.  It was signed by Mr. Salazar on behalf of PWT on or about September 29, 2021.

      a.      The Preamble stated that "[t]he Parties wish to agree on a fair and equitable method of resolution for their dispute in relation to the LSA" ("Dispute")

      b.      The Preamble of the DRA further stated:

> The Parties agree that an amount of USD 200,000 is presently due and owing to Kalbian and will be paid as follows: PWT will pay USD 50,000 immediately upon receipt by email of a copy of this Agreement executed by Kalbian, and another USD 150,000 within 10 days after receipt by email of a copy of this Agreement executed by Kalbian.  Once timely paid, this USD 200,000 will not be subject of the Dispute.

      c.      Section 7 of the DRA stated *inter alia*: "The merits of the Dispute will be decided under UAE law."

    d.  Section 9 of the DRA stated: "This Agreement will be supplemented by rules to govern the arbitration.  The parties will decide on the applicable rules to govern the arbitration within twenty (20) days from the execution of this Agreement."

    e.  Section 11 of the DRA specifically provided that timely payment of the US$200,000 was a "Condition Precedent." It stated that "[t]his Agreement will be effective subject to PWT paying the amount of USD 200,000 due under the LSA as set forth in the Preamble above. Should PWT fail to make this payment, this Agreement will be deemed void and Kalbian will be permitted to pursue its claim under Clause 8 of the LSA."

  46.  Before Mr. Salazar executed the DRA, Mr. Heppner, sent an email to Mr. Kalbian on or about September 29, 2021 stating: "For compliance purposes, PWT needs invoices from you for the USD 50k and the USD 150k that request payment to your Dubai account.  Please issue these invoices right away so that PWT can process the payments and make the USD 50k payment right away."

  47.  Kalbian Hagerty issued a second Invoice No. 118 on or about September 29, 2021 for US$50,000.  Although Kalbian Hagerty had already issued an invoice numbered 118 on September 17, 2021, the firm inadvertently numbered this second Invoice No. 118 ("Invoice No. 118 dated September 29, 2021").  According to the Preamble of the DRA, the US$50,000 was due "immediately."

  48.  On or about October 4, 2021, PWT made the US$50,000 payment for Invoice No. 118 dated September 29, 2021 by wire transfer.

  49.  On October 4, 2021, Kalbian Hagerty issued Invoice No. 119 for US$150,000. Invoice No. 119 stated on its face: "Please transmit the balance noted below payable on or before

October 8, 2021 in accordance with the Preamble of the Dispute Resolution Agreement dated September 28, 2021."

50. PWT failed to pay Invoice No. 119 by the deadline in the DRA.

51. On or about October 13, 2021, Mr. Kalbian informed Mr. Heppner that PWT was in breach of the DRA by failing to pay the US$150,000 in a timely manner.

52. Neither PWT nor its counsel denied that PWT was in breach of the DRA for failing to pay the US$150,000 in a timely manner.

53. In addition, PWT and Kalbian Hagerty did not "decide on the applicable rules to govern the arbitration within twenty (20) days from the execution" of the DRA.

54. On or about December 1, 2021, Mr. Heppner and his colleague, Lisa Becker, spoke via ZOOM Video Conference with Ishaak Meeran and Bill McGrath of Kalbian Hagerty. During that video conference, Mr. Heppner acknowledged that when PWT was late with the payment of US$150,000 that was due on October 8, 2021, Kalbian Hagerty asserted that there had been a breach of the DRA. Mr. Heppner also pointed out that the parties planned to agree on supplemental rules within 20 days of the signing of the DRA (which did not happen). Mr. Heppner insisted that the Parties needed to reconfirm the existence of the DRA and formally amend the DRA.

55. In an email sent on or about December 6, 2021 to Mr. Kalbian, Mr. Heppner stated: "PWT is still agreeable to go forward with the arbitration."

56. In an email sent on or about December 15, 2021 to Mr. Heppner, Mr. Kalbian stated:

> I wanted to let you know that I do not have a definitive reply for you. I still need to convince my partners in DC of the idea of still proceeding with the arbitration ***in light of the breach*** of our agreement by PWT. I have made a recommendation to the partners but with the holiday season and vacations, I do not anticipate speaking to them on this issue until after the new year.

(Emphasis added.) Neither PWT nor its counsel responded to or otherwise denied Mr. Kalbian's claim that PWT had breached the DRA by failing to pay the US$150,000 in a timely manner.

57.     PWT has paid Invoice No. 118 dated September 29, 2021 for US$50,000 and Invoice No. 119 for US$150,000 (albeit in an untimely manner under the DRA).  However, PWT has not paid any portion of Invoice No. 118 dated September 17, 2021 for US100,000 or Invoice No. 116 for US$1,278,339.111, thereby breaching the LSA.

## COUNT I

### (Breach of Contract)

58.     The allegations of paragraphs 1 through 57 are restated and incorporated as though fully set forth herein.

59.     Kalbian Hagerty and PWT entered into the LSA, a valid, binding contract to perform legal services. The LSA is governed by the laws of the United Arab Emirates.

60.     Kalbian Hagerty performed work for PWT under the LSA between May 2018 and August 2021. Kalbian Hagerty successfully defended PWT against SAMA's claims.  That outcome resulted in PWT eliminating a potential US$44 million liability off its books.  Under the LSA, Kalbian Hagerty is entitled to a success fee for that successful defense.

61.     Based on its successful defense of SAMA's claims, Kalbian Hagerty issued an invoice for US$1,578,339.11 on or about June 22, 2021.  Following a series of communications between Kalbian Hagerty and PWT and its counsel:

    a.     Kalbian Hagerty issued and PWT paid Invoice No. 118 dated September 29, 2021 for US$50,000 and Invoice No. 119 for US$150,000 (although not in a timely manner); and

      b.     PWT has not paid any portion of Invoice No. 118 dated September 17, 2021 for US100,000 or Invoice No. 116 for US$1,278,339.11.

      62.     PWT has breached its contractual obligation to pay for the legal services rendered by Kalbian Hagerty by willfully failing and refusing to make timely payment of legal fees owed.

      63.     WHEREFORE, Plaintiff requests that judgment be entered in its favor and against PWT in a sum to be proven at trial, but in no event less than US$1,378,339.11, plus pre-judgment and post-judgment interest at the applicable judgment rate, and all recoverable costs.

## COUNT II

### (For Quantum Meruit)

      64.     The allegations of paragraphs 1 through 63 are restated and incorporated as though fully set forth herein.

      65.     Under the laws of the United Arab Emirates, which governs the relationship between the parties to the LSA, a claim for quantum meruit may be asserted when there has been unforeseen circumstances which imposed substantial losses on one party above what would reasonably be expected in the performance of the contract.

      66.     As alleged herein, there were unexpected and unforeseen changes in circumstances, including, but not limited to, the conduct of SAMA and its inept counsel, who consistently and flagrantly flouted the agreed procedural rules of the Arbitration resulting not only in undue prejudice to Kalbian Hagerty to respond to each and every failure, but unreasonably extended the timeline of the Arbitration.  Claimant counsel's actions and the events caused by the COVID-19 Pandemic, substantially increased the amount of time Kalbian Hagerty had to spend in representing PWT above and beyond the amount that was contemplated at the time PWT and Kalbian Hagerty entered into the LSA.

67. Under UAE law governing quantum meruit, Kalbian Hagerty is entitled to recover for the work it performed for PWT related to the Arbitration, despite the existence of the binding contract.

68. PWT has retained a benefit from the work that Kalbian Hagerty performed for them, work for which PWT has not paid for the benefit of the services received.

69. Before Kalbian Hagerty filed its submissions on costs, the amount of legal fees on or about March 15, 2021, PWT reviewed, approved, and ratified the document which stated that the legal fees expended by Kalbian Hagerty for the Arbitration was US$2,809,891.

70. PWT has paid the US$800,000 fixed fee, plus US$200,000, as described above.

71. WHEREFORE, Kalbian Hagerty LLP requests that judgment be entered in its favor and against PWT in a sum to be proven at trial, but in no event less than US$500,000 plus pre-judgment and post-judgment interest at the applicable judgment rate, and all recoverable costs.

Dated: January 28, 2022

Respectfully submitted,

KALBIAN HAGERTY LLP

By: /s/ Haig V. Kalbian
Haig V. Kalbian (Bar No. 400976)
William P. McGrath, Jr.
(Bar No. 422160)
888 17th Street NW
Suite 1200
Washington, DC 20006
(202) 223-5600
hkalbian@kalbianhagerty.com
wmcgrath@kalbianhagerty.com

*Attorney for Plaintiff Kalbian Hagerty LLP*